IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DE'AMONTAE MANNING,

      Plaintiff,

v.

      Civil Action 1:22-cv-371
      Judge Michael R. Barrett
      Magistrate Judge Kimberly A. Jolson

RONALD ERDOS, et al.,

      Defendants.

## ORDER

This matter is before the Court on Defendant's Response to Order to Show Cause (Doc. 91) and Plaintiff's Motion to Appoint Counsel (Doc. 94). The Court **RESERVES** the issue of sanctions, and Plaintiff's Motion to Appoint Counsel is **HELD in abeyance**.

**I. BACKGROUND**

In its Show Cause Order, the Court discussed at length the events giving rise to this action and the parties' discovery efforts. (*See generally* Doc. 89). Plaintiff's allegations include several events and ten defendants, but here, the Court summarizes only the facts relevant to the Show Cause Order.

    **A.**     **Solitary Confinement**

First, on April 23, 2022, Plaintiff says he was placed in solitary confinement in a cell at Southern Ohio Correctional Facility (SOCF). (Doc. 1 at 7). According to Plaintiff, the cell contained no sheets, blankets, socks, towels, washcloths, hygiene products, or other property, but it was "contaminated" with feces in the toilet and on the walls, urine on the floor, and mace on the mattress. (*Id.*). Plaintiff says he asked Defendants Harris, Groves, and Keeney for cleaning products, but they denied his requests. (*Id.*). Plaintiff remained in the cell for five days. (*Id.*).

During that time, he filed multiple informal complaints stating that Defendants Harris, Groves, and Keeney were violating his Eighth Amendment rights. (*See id.* at 14, 17). He further said that Defendant Harris "should be held liable [and] responsible for the inhuman[e] conditions." Finally, on May 11, 2022, Plaintiff filed a formal grievance, again repeating that these Defendants violated his constitutional rights. (*Id.* at 12). Plaintiff filed this case approximately one month after this grievance was denied. (*See id.*). During discovery, Plaintiff requested wall camera footage of the solitary confinement cell for two separate days, seeking recordings of the cell's conditions and his conversations with Defendants Harris, Groves, and Keeney about cleaning supplies. (*See* Doc. 46 at 3, 5).

### B. Mental Health Evaluation

On August 31, 2022, just two months after Plaintiff filed his complaint, Plaintiff says Defendant Fuller denied him a mental health evaluation. (Doc. 6). Plaintiff wrote a letter to the Court about this incident, which was filed on September 22, 2022. (*Id.*). According to Plaintiff, Defendant Fuller denied him the evaluation, so Plaintiff would be under continuous observation by prison officials. (*Id.*). Defendant Fuller also allegedly told Plaintiff that he would not have access to legal documents while under observation. (*Id.*). On October 17, 2022, the Court allowed Plaintiff to proceed on a retaliation claim for this incident. (Doc. 7 at 5, 8–9, 12). Plaintiff also requested wall camera footage for this interaction with Defendant Fuller. (Doc. 46 at 2).

### C. Assault

In that same September 22, 2022, letter to the Court, Plaintiff described an alleged assault by Defendants Mullenix and Sparks on September 8, 2022. (Doc. 6 at 2). Plaintiff reported that this incident was "on camera" and that Defendants did not follow the prison's use-of-force procedures. (*Id.*). After this incident, Plaintiff alleges that various Defendants denied him access

2

to grievance procedures, so he spoke to an institutional inspector at the prison about this assault on September 19, 2022. (*Id.* at 3). A month after this letter, the Court allowed Plaintiff to proceed on retaliation claims against Defendants Mullenix and Sparks for this incident. (Doc. 7 at 6, 8–9, 12). Plaintiff asked for wall camera footage of this assault during discovery. (Doc. 46 at 4).

### D. Meal Contamination

The last relevant incident involves Plaintiff's allegations that Defendant Petiniot retaliated against him for filing this lawsuit by tampering with his meals on November 2, 2022. (Doc. 10). The Court granted Plaintiff's motion to amend to add a retaliation claim related to this incident on December 21, 2022. (Doc. 17 at 3). Again, Plaintiff requested video footage of the alleged meal tampering in his discovery requests. (Doc. 46 at 1).

### E. Non-Preservation of Video Footage and the Court's Show Cause Order

The parties litigated numerous motions to compel and filed multiple status reports throughout the course of discovery. (*See* Docs. 48, 53, 56, 64, 66, 84 (Plaintiff's motions to compel discovery); Docs. 59, 62, 77, 86, 88, (status reports from the parties on discovery)). The Court granted Plaintiff's Motion to Compel Defendants to produce video footage he requested on February 1, 2024. (Doc. 65 at 2 (granting Doc. 64)). Defendants informed the Court on March 4, 2024, that almost all the footage Plaintiff requested was not preserved. (Doc. 77 at 2 (averring that "no other video footage responsive to plaintiff's request exists)). While Plaintiff viewed limited footage of the alleged assault involving Defendants Mullenix and Sparks, Defendants represented the rest of the footage Plaintiff requested no longer existed. (*Id.* at 2).

So, on March 7, 2024, the Court ordered Defendants to submit affidavits explaining why the footage did not exist. (Doc. 81). In response, Defendants filed two affidavits from prison employees. (*See* Doc. 86). The affidavits explained that wall camera footage at each institution

3

is preserved for only forty-five days, "unless it is requested by the inmate or flagged by prison staff to be saved as part of an investigation." (*Id.* at 5–6, 9–10). So, for Plaintiff's solitary confinement, mental health evaluation, and meal contamination footage requests, Defendants represented that the footage was not preserved pursuant to this policy. (*Id.*). But the footage for the alleged assault was more complicated. Defendants said that footage from 7:43 AM until 7:50 AM on September 8, 2022—the day of the incident—was preserved. (*Id.* at 2–3). But footage before and after those times were not, even though Plaintiff requested footage from 7:00 AM until 10:00 AM. (*Id.*; Doc. 46 at 4 (Plaintiff's footage requests)). Plaintiff also wrote to the Court that the alleged assault occurred before 7:43 AM. (Doc. 85 at 1).

Based upon the representations and timeline offered in these filings, much of the footage Plaintiff requested could have been destroyed while Defendants would have been on notice that litigation was likely or ongoing. As a result, on April 1, 2024, the Court issued a Show Cause Order, instructing Defendants to explain who viewed the video footage, when the footage was destroyed, and why the footage was not preserved.[1] (Doc. 89 at 13).

F. **Defendants' Response to the Show Cause Order**

Defendants timely responded to the Show Cause Order. (Doc. 91). In their Response, Defendants clarified the preservation policies at issue, because, in their previous affidavits, they had represented that all footage for these incidents would be preserved for forty-five days unless

---

[1] The Court's Show Cause Order was limited only to wall camera footage, although Plaintiff also requested body camera footage that was not preserved. (Doc. 89 at 9). This is because, according to Defendants' affidavits, there is a limited eighteen-hour window to recover footage if a prison official does not activate their body-worn camera during an incident. (*Id.*). In the circumstances presented here, the Court cannot be certain that Defendants should have reasonably anticipated litigation within eighteen hours of each incident involving Plaintiff. However, this policy will not always absolve prison officials of their duty to preserve evidence. *See, e.g.*, *Hargis v. Overton Cnty., Tenn.*, No. 2:22-cv-00011, 2023 WL 8604139, at *7 (M.D. Tenn. Dec. 12, 2023) (discussing that, when prisoners are seriously injured or die in custody, government defendants reasonably should anticipate litigation from the time of the injury or death) (citing cases); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 469 (E.D. Penn. 2020) (stating that courts have found in some cases that a duty to preserve evidence attaches when prisoners are assaulted or when they file grievances) (internal quotation omitted).

4

it was manually saved. (Doc. 86 at 5–6, 9–10). Defendants now say that prior to April 2022, footage was preserved for only fourteen days. (Doc. 91 at 3). But after August 15, 2022, that preservation period increased to forty-five days. (*Id.* at 2 n.1 (discussing revisions to Ohio Department of Rehabilitation and Correction's (ODRC) Policy 09-INV-01)). Defendants represent that, after the relevant preservation period, footage is automatically overwritten unless prison staff "manually saves" it. (*Id.* at 2). Under the policy, footage is saved only if it is "requested by an inmate or flagged as being necessary to complete an investigation." (*Id.*). Now, the Court turns to Defendants' explanations for the non-preservation of each incident's video footage.

        *1.      Solitary Confinement*

First, the Court addresses Plaintiff's allegations surrounding his five days in solitary confinement. Because this confinement occurred in late April 2022, Defendants say that the relevant policy required footage to be kept for fourteen days, "unless it [was] requested by an inmate or flagged as being necessary to complete an investigation." (*Id.* at 2–3). Defendants assert that this fourteen-day policy made it impossible for Defendants to request that this footage be preserved, since Plaintiff's lawsuit was not filed until June 27, 2022, two months after Plaintiff's time in solitary confinement.

Still more, Defendants say that even though "Plaintiff did file a grievance regarding these allegations, this [incident] is not the sort of grievance that footage would ordinarily be preserved for." (*Id.* at 3). According to Defendants, wall cameras at Southern Ohio Correctional Facility do not view inside cells, and the cameras do not record audio. (*Id.*). So, "no footage relating to the condition of Plaintiff's cell" and no "alleged denial of cleaning supplies [by Defendants Harris, Groves, and Keeney] would be represented in the footage." (*Id.*). Defendants explain this footage

5

was not preserved because prison officials determined it would not be "useful or relevant for an investigation into Plaintiff's grievance."

        2.        *Mental Health Evaluation*

Next, Plaintiff requested wall camera footage for Defendant Fuller's alleged denial of a mental health examination on August 31, 2022. (Doc. 46 at 2). Defendants offer two explanations for why this evidence was not kept. First, they say that although Plaintiff filed his letter about this incident with the Court on September 22, 2022, Defendant Fuller was not served until February 6, 2022. (Doc. 91 at 3–4). Because the policy required the footage to be kept for only forty-five days, Defendants say Defendant Fuller "could not have been on notice that any footage regarding the alleged denial of a mental health examination would be relevant to future litigation such that he could have requested its preservation." (*Id.*). Second, Defendants also explain that because the wall cameras do not record audio, "the footage would not have yielded relevant or useful information for an investigation." (*Id.* at 44 (stating a prison official does "not save footage when the grievance is about something prison staff said to an inmate, because the wall cameras do not capture audio)). So, the footage was automatically overwritten after forty-five days. (*Id.* at 4).

        3.        *Alleged Assault*

The alleged assault by Defendants Mullenix and Sparks on September 8, 2022, is the only incident for which any video footage remains. (*Id.*). Defendants assert that this footage was saved because Plaintiff alleged an excessive use of force. (*Id.* at 5). But importantly, Defendants preserved footage only from 7:43 AM to 7:50 AM, (Doc. 86 at 2–3), and Plaintiff alleges the assault occurred before this time. (Doc. 85 at 1). Defendants admit that the 7:43 to 7:50 AM block does not encompass the entirety of Plaintiff and Defendants' interactions that morning. (Doc. 91 at 5). Yet Defendants also say that "Institutional Inspector Jenkins . . . reviewed the entirety of the

6

incident and saved the relevant footage . . . [and] attests that no assault occurred." (Doc. 91 at 5). According to Defendants, Inspector Jenkins "preserved footage starting immediately before the officers made physical contact with the Plaintiff." (*Id.* at 44). Defendants also offer other evidence of Inspector Jenkins's investigation into the incident, including medical reports from a week after the incident showing "[n]o noted injuries." (*Id.* at 54). But any additional footage was automatically overwritten after forty-five days. (*Id.* at 6).

### 4. Meal Contamination

Because the alleged meal tampering incident occurred on November 2, 2022, any wall camera footage would be kept for forty-five days, according to Defendants. For the alleged meal tampering incident, Defendants say that the prison's inspector reviewed relevant footage for the incident. (Doc. 91 at 4). But footage was not saved "because it did not show any contamination of Plaintiff's food," and the prison did not conduct a "continuing investigation" on that basis. (*Id.*). Defendants also argue that Defendant Petiniot "was not on notice that the footage would be relevant for future litigation" during the critical forty-five-day period because although Plaintiff moved to amend his complaint on November 8, 2022, Defendant Petiniot was not served until February 7, 2023. (*Id.*). Notably, Defendants' discovery responses to Plaintiff include references to at least six grievances or complaints filed by Plaintiff against Defendant Petiniot. (*Id.* at 12).

## II. STANDARD

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Hargis*, 2023 WL 8604139, at *6 (quoting *Billiter v. SP Plus Corp.*, F. Supp. 3d 459, 465–66 (M.D. Tenn. 2018)). Federal Rule of Civil Procedure 37 requires parties to take reasonable steps to preserve electronically stored information, including digitally stored video footage, in anticipation of

7

litigation. *See Johns v. Gwinn*, 503 F. Supp. 3d 452, 461–62 (W.D. Va. 2020) (stating that when video footage is saved electronically, it constitutes electronically stored information for the purposes of Federal Rule of Civil Procedure 37(e)). When such evidence is not preserved, courts have "broad discretion to craft proper sanctions[.]" *Adkins v. Wolever*, 692 F.3d 499, 503 (6th Cir. 2012). Courts can impose a range of sanctions for spoliated evidence, including awarding fees, striking evidence, permitting arguments and evidence to be presented to a jury about the lost evidence, and even instructing the jury how it must interpret that loss. *See Bistrian*, 448 F. Supp. at 478 (citing Fed. R. Civ. P. 37(e)(1) Advisory Committee's Note to 2015 Amendment.). In deciding whether sanctions are warranted, courts consider the following three-part test:

> (1) [whether] the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) [whether] the records were destroyed 'with a culpable state of mind'; and (3) [whether] the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

The obligation to preserve evidence arises when a party "should have known that the evidence may be relevant to future litigation." *Byrd v. Alpha All. Ins. Corp.*, 518 F. App'x 380, 384 (6th Cir. 2013) (internal quotation omitted). This duty "arises no later than when a lawsuit is filed but may be triggered earlier than the filing of the complaint depending on the particular circumstances." *Bistrian*, 448 F. Supp. 3d at 468 (citing *Marten Transp., Ltd. v. Platform Advert., Inc.*, No. 14-2464, 2016 WL 492743, at *5 (D. Kan. Feb. 8, 2016); *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998)). For example, in the context of prisoner litigation, courts should consider "the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the course of conduct between the parties, including past litigation or threatened litigation; and what steps both parties took after the incident and before the loss of the evidence, including whether the

8

defendant initiated an investigation into the incident." *Id.* (internal quotations omitted). In some circumstances, courts have found that a prisoner's filing of grievances is sufficient notice that litigation may occur, and evidence should be preserved. *See, e.g.*, *Vega v. Broome Cnty.*, 9:21-cv-788, 2023 WL 6318919, at *7 (N.D. N.Y. Sept. 28, 2023); *Annabel v. Frost*, 14- 10244, 2023 WL 2015577, at *3 (E.D. Mich. Feb. 15, 2023); *Scruggs v. Miller*, No. 3:17-cv-467-PPS-MGG, 2021 WL 1739973, at *3 (N.D. Ind. Mar. 8, 2021); *Johns*, 503 F. Supp. 3d at 465–66; *Allen v. Richardson*, No. 16-cv-410, 2019 WL 135683, at *1–2 (W.D. Wisc. Jan. 8, 2019); *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1107–8 (D. Ariz. 2014).

Second, a "proper spoliation sanction should serve both fairness and punitive functions," and the severity of the sanction should correspond to the party's "degree of fault under the circumstances," including "innocence through the degrees of negligence to intentionality." *Beaven*, 622 F.3d at 554 (internal quotations and citations omitted). Lastly, evidence is relevant if a party can make "some showing indicating that the destroyed evidence would have been relevant to the contested issue." *Id*.

### III. DISCUSSION

Starting with the first factor, Defendants repeatedly assert in their Response that they could not be on notice that any footage would be relevant to future litigation, because they were not served before the expiration of the video preservation period. (Doc. 91 at 3–4, 6). But that is not the law. Nor could it be, considering the exhaustion requirement of the Prison Litigation Reform Act (PLRA). The PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." *Lamb v. Kendrick*, 52 F.4th 286, 292 (6th Cir. 2022) (quoting 42 U.S.C. § 1997e(a)). Furthermore, "the inmate's correctional institution

9

defines the applicable procedural rules that the inmate must follow to exhaust his administrative remedies." *Id.* Said differently, a prisoner must follow the procedural rules of the institution and complete each step of the applicable grievance process before filing a lawsuit in federal court. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010).

In Ohio, a prisoner must undergo a three-step process before they may bring their claims to federal court. *See* Ohio Admin. R. 5120-9-31(J)(1–3). These administrative steps can take weeks or even months to complete. Once the prisoner does file suit, they must necessarily rely on counsel or the courts to serve the defendants due to their incarceration. *See Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996) ("When a plaintiff is proceeding *in forma pauperis* the court is obligated to issue plaintiff's process to a United States Marshal who must in turn effectuate service upon the defendants, thereby relieving a plaintiff of the burden to serve process once reasonable steps have been taken to identify . . . the defendants named in the complaint."). This process, too, takes time. If prison officials were under no duty to preserve evidence until they were served, evidence could be destroyed without consequences in many cases involving a prisoner plaintiff.

Courts apply an objective standard when determining if a party was on notice that evidence may be relevant to future litigation. *See John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)); *Byrd*, 518 F. App'x at 384 ("We apply an objective, not subjective standard."). So, what matters is when Defendants "should have known that the [video] evidence may be relevant to future litigation," not when Defendants subjectively learned of this litigation or were served. *John B.*, 531 F.3d at 459. Here, Plaintiff submitted many grievances, beginning almost immediately after each incident, that should have put Defendants on notice that litigation was imminent or already pending.

10

Beginning with Plaintiff's solitary confinement allegations, the Court recognizes that the prison's previous fourteen-day preservation policy would make saving footage for litigation more difficult. But Plaintiff filed numerous informal complaints and grievances about Defendants Harris, Groves, and Keeney starting the day after he was placed in solitary confinement. (Doc. 1 at 11, 12, 14, 17). In those documents, Plaintiff repeatedly stressed his belief that his constitutional rights were violated, that these Defendants should be held accountable, and that their conduct violated various prison policies. (*See id.*). Plaintiff's statements about his legal rights put Defendants on notice that litigation was likely and that evidence relevant to these issues should be preserved.

For the alleged denial of a mental health evaluation on August 31, 2022, Plaintiff seemingly filed an administrative complaint against Defendant Fuller. (Doc. 91 at 24 (discovery responses from Defendants to Plaintiff)). While the Court does not have access to this complaint, in his filing dated less than a month after the incident, Plaintiff represented that he "informed employers" of Fuller's actions, that nothing was done, and that he was consequently "seeking help from legal services." (Doc. 6 at 1). Plaintiff also claimed that Defendant Fuller told him that without a mental health evaluation, he would not have "access to any incoming legal documents pertaining" to his civil lawsuit. (*Id.*). If these allegations are true, Defendant Fuller knew of this case long before he was served and was arguably on notice that Plaintiff could also pursue legal action against him. Defendants do not address these allegations in their Response. (*See* Doc. 91 at 3–4 (stating only that Defendant Fuller could not have been on notice since he wasn't served until February 2022)).

Next, for Plaintiff's meal contamination allegations, Plaintiff also filed numerous grievances and administrative complaints against Defendant Petiniot. (Doc. 91 at 12). One of these was filed just three days after the alleged meal contamination incident on November 2, 2022.

11

(Doc. 91 at 49 (informal complaint filed by Plaintiff on November 5, 2022)). In it, Plaintiff stated that Defendant Petiniot retaliated against him for "filing a civil suit against regular co workers" by "placing fingers" inside his food. (Doc. 91 at 49). Plaintiff further referenced "body camera[s]" in his complaint. (*Id.*). Two weeks later, Inspector Michael Jenkins found this grievance unsubstantiated after reviewing video footage of the incident and interviewing Defendant Petiniot. (*Id.*). So, based on this complaint alone, Plaintiff notified the prison that he was pursuing a civil lawsuit against other prison employees. Plaintiff also seemingly requested video footage in his administrative complaint, and Inspector Jenkins reviewed that footage. Still, it was not preserved. In light of these facts, Defendants' arguments that they were not on notice that the footage should be saved until Petiniot was served are unconvincing. (*See id.* at 4).

But perhaps the most troubling incident is the alleged assault by Defendants Mullenix and Sparks. Plaintiff filed a complaint on September 14, 2022, less than a week after the alleged assault. (Doc 91 at 51). In the complaint, Plaintiff says the assault occurred between 7:00 AM and 9:00 AM. (*Id.*). Institutional Inspector Michael Jenkins did not respond to Plaintiff's complaint until a month later. (*Id.*). In his response, Inspector Jenkins stated he reviewed the video footage "multiple times." (*Id.*). Then, Inspector Jenkins discussed that the video showed Plaintiff sitting in water outside his cell and officers "standing around" and "communicating" with Plaintiff. (*Id.*). Inspector Jenkins represented that the video showed no "kicks" or assault. (*Id.*). In addition, Inspector Jenkins stated that he interviewed Defendants Mullenix and Sparks before resolving the grievance. (*Id.*). Three days later, Plaintiff appealed Inspector Jenkins's decision and said that the video "clearly show[ed]" Defendants Mullenix and Sparks kicking him, kneeing him in the ribs, and dragging him down the stairs. (*Id.*). A few weeks after that, the Chief Inspector denied Plaintiff's appeal. These administrative records also note that Plaintiff was seen by medical

12

staff multiple times between September 8, 2022, and September 15, 2022, and that Plaintiff had "no complaints" related to this incident. (*Id.* at 54). After all this, Inspector Jenkins preserved footage from 7:43 AM to 7:50 AM only. Defendants argue that Defendants Mullenix and Sparks were not on notice that additional footage should be preserved until they were served in February 2023. (*Id.* at 6). Under an objective standard, and considering the grievance discussed above, Defendants were on notice sooner.

Courts have found that assaults on prisoners "combined with other circumstances . . . may often be enough that defendants should reasonably anticipate litigation beginning soon after the incident itself." *Bistrian*, 448 F. Supp. 3d at 469; *Hargis*, 2023 WL 8604139, at *7 (noting that certain types of incidents, including when prisoners are seriously injured, are viewed as being more likely to lead to litigation); *Barnes v. Harling*, 368 F. Supp. 3d 573, 607 (W.D. N.Y. 2019) (same) (citing cases). These circumstances can include a plaintiff's statements and conduct after the incident, the parties' prior relationship, and a defendant's decision to open an investigation. *See Bistrian,* 448 F. Supp. 3d at 469–70.

That is the case here. Notably, Inspector Jenkins conducted an investigation into this incident after Plaintiff filed his grievance, and Plaintiff already had civil litigation pending by the time of the alleged assault. Defendants reasonably should have anticipated Plaintiff would take legal action. (Doc. 91 at 5–6 (noting that Inspector Jenkins interviewed witnesses, ordered a medical examination of Plaintiff, and viewed the footage in response to Plaintiff's grievance)). What's more, Plaintiff clearly outlined the time period relevant to this incident and mentioned video footage in his grievance. (Doc. 91 at 51). Still, no additional footage was preserved, even though under the policy described by Defendants, this footage likely should have been saved at Plaintiff's request. (*Id.* at 27–28 (stating that footage may be saved at the request of an inmate)).

13

On the whole, it appears that Defendants were obligated to preserve video footage evidence for at least some of these incidents. Next, the Court must consider Defendants' state of mind when this footage was destroyed. Defendants make few arguments regarding this factor, but they say the footage was automatically overwritten pursuant to policy, as it was deemed irrelevant to litigation or other administrative investigations. (*Id.* at 3–4, 6). But "even if the evidence was not deliberately destroyed, negligence or inadvertent destruction of evidence is sufficient to trigger sanctions." *Pullins v. Klimley*, No. 3:05-cv-082, 2008 WL 85871, at *5 (S.D. Ohio Jan. 7, 2008) (citing *In re Smartalk Teleservices, Inc. Sec. Litig.*, 487 F. Supp. 2d 947, 950 (S.D. Ohio 2007)); *see Adkins*, 554 F.3d at 652–53 (noting that "failures to produce evidence fall along a continuum of fault" and that sanctions should be tailored accordingly (internal quotation omitted)). Defendants' failure to preserve video footage may rise to a level of culpability warranting sanctions, especially in the two incidents where Plaintiff seemingly requested and prison officials reviewed footage but did not save it.

Finally, the third factor concerns the footage's relevance to this case. Evidence is deemed relevant if "a reasonable trier of fact could find that it would support the moving party's claim." *Byrd*, 518 F. App'x at 385 (internal quotation omitted). The court may "consider circumstantial evidence in analyzing the import or specifics of the destroyed evidence." *Id.* (citing *Beaven*, 622 F.3d at 555). For this factor, Defendants represent that the destroyed footage would not have been relevant. For instance, Defendants say that because the wall cameras do not record audio, any footage obtained of Plaintiff's interactions with Defendants Harris, Groves, Keeney, and Fuller would not support his allegations. (Doc. 91 at 3–4). Even so, this footage could have shown interactions between Defendants and Plaintiff at the times and places he alleged. If these claims proceed to trial, a jury may have to decide whether to believe Plaintiff's or Defendants' version of

14

events. While not critical evidence, this footage could have bolstered Plaintiff's credibility and provided circumstantial evidence in support of his claims.

More still, video evidence could have been dispositive for Plaintiff's claims against Defendants Fuller, Mullenix, and Sparks. Based upon Defendants' representations, had the footage had been preserved, a jury or the Court could have directly viewed Defendants' actions and determined whether meal tampering or an assault occurred. *See Peschel v. City of Missoula*, 664 F. Supp. 2d 1137, 1145 (D. Mont. 2009) ("The obvious inherent value of the video recording is that it would have allowed the jury . . . to see the actual events unfold and make its own collective assessment[.]"). For the allegations against Defendant Petiniot, Plaintiff states that the video footage would support his version of events, while materials provided by Defendants state that the video showed no food tampering. (Doc. 91 at 49). For Defendants Mullenix and Sparks, Plaintiff says that the assault occurred before the preserved portion of the footage, while Defendants say that Inspector Jenkins reviewed all the footage and concluded that no assault occurred. (*See* Doc. 85 at 1, Doc. 91 at 5). Because the footage was not preserved, it is now impossible to know who is correct. *See Hargis*, 2023 WL 8604139, at *13 (noting that plaintiff must speculate as to what the deleted video would show because she cannot view it).

At this point, however, the Court has limited evidence for the claims and defenses in this case other than the parties' representations. And the record is not clear on what other evidence Plaintiff possesses to support his allegations and, consequently, how much he has been prejudiced by the loss of this footage. *Cf. Herbert v. Baker*, No. 09-cv-12314, 2010 WL 5330050, at *6 (E.D. Mich. Dec. 21, 2010) (finding that the plaintiff was not severely prejudiced, considering she also had depositions and admissions supporting her claims). Therefore, the Court **RESERVES** the issue of sanctions until later in this litigation when the record is more fully developed.

### IV. PLAINTIFF'S MOTION TO APPOINT COUNSEL

While this Show Cause Order was pending before the Court, Plaintiff filed a Motion to Appoint Counsel. (Doc. 94). In his Motion, Plaintiff says that a "trial in this case will likely involve conflicting testimony and counsel would better enable Plaintiff to present evidence and cross examine witnesses." (*Id.*). That is all true. But at this stage, it is not certain which of Plaintiff's claims will proceed past dispositive motions to trial. Furthermore, the appointment of counsel in a civil proceeding is not a constitutional right and is justified only by exceptional circumstances. *Lavado v. Keohane*, 992 F.2d 601, 604-05 (6th Cir. 1993). So, for now, the Court **HOLDS** Plaintiff's Motion **in abeyance**.

### V. CASE SCHEDULE

The dispositive motion deadline in this case has been stayed since April 1, 2024, to allow the Court to resolve discovery issues. (*See* Doc. 89 at 13). With this Order, the Court **LIFTS** that stay. Dispositive motions are due **thirty (30) days from the date of this Order**. Responses and replies to dispositive motions shall be filed according to this District's Local Rules. *See* S.D. Ohio Civ. R. 7.2(a)(2) (stating oppositional responses "shall be filed within twenty-one days after the date of service of the motion" and replies "within fourteen days after the date of service of the" response).

### VI. CONCLUSION

The Court **RESERVES** the issue of sanctions until a later stage in this litigation. Similarly, Plaintiff's Motion to Appoint Counsel (Doc. 94) is **HELD IN ABEYANCE**. Dispositive motions are due **within thirty (30) days of the date of this Order**.

IT IS SO ORDERED.

Date: June 7, 2024                                                  /s/ Kimberly A. Jolson
                                                                    KIMBERLY A. JOLSON
                                                                    UNITED STATES MAGISTRATE JUDGE